# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA

V.

CRIMINAL COMPLAINT

JOHN J. KELLOGG
(d.o.b. xx/xx/64)

CASE NUMBER: 11-M- 675

I, Steven Stoinski, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief. **(Count One)** Between September 8, 2009 and September 11, 2009, in the State and Eastern District of Wisconsin and elsewhere, John J. Kellogg did sell and transport in interstate commerce, wildlife valued in excess of $350.00, knowing both that the wildlife was taken and possessed in violation of Wisconsin Statute § 29.024, and that he engaged in conduct involving its sale in violation of Title 16, United States Code, Sections 3372(a)(2) and (4) and 3373(d)(1)(B). **(Count Two)** Between September 4, 2011 and September 9, 2011, in the State and Eastern District of Wisconsin and elsewhere, John J. Kellogg did sell and transport in interstate commerce, wildlife valued in excess of $350.00, knowing both that the wildlife was taken and possessed in violation of Wisconsin Statute §§ 29.024 and 29.184, and that he engaged in conduct involving its sale in violation of Title 16, United States Code, Sections 3372(a)(2) and (4) and 3373(d)(1)(B).

I further state that I am a Special Agent with the U.S. Fish and Wildlife Service, and this complaint is based on the following facts:

Please see the attached affidavit.

Continued on the attached sheet and made a part hereof:   _X_ Yes  ___ No

_____
Signature of Complainant
**SA Steve Stoinski**

Sworn to before me and subscribed in my presence,

_Oct 3, 2011_
Date

at Green Bay, Wisconsin
City and State

The Honorable James R. Sickel
United States Magistrate Judge
**Name & Title of Judicial Officer**

_____
Signature of Judicial Officer

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT & ARREST WARRANT

I, Steven Stoinski, being first duly sworn, state that:

1.     I am a Special Agent (SA) with the U.S. Fish and Wildlife Service-Office of Law enforcement (FWS). I have been an agent for approximately fourteen years. As part of my duties, I investigate violations of federal wildlife laws, commonly called the Lacey Act, set forth at 16 U.S.C. §§ 3372 and 3373.

### Basis for Information in Affidavit

2.     The information contained in this affidavit is based upon my personal knowledge and investigation, and information supplied to me by other law enforcement officers including Wisconsin Department of Natural Resources (WDNR) investigators, all of whom I believe to be truthful and reliable. Based on my investigation and the information supplied to me by other law enforcement personnel, I have probable cause to believe the following regarding John J. Kellogg.

### Statutory Provisions

3.     Title 16, United States Code, Sections 3372 and 3373(d)(1)(B), of the Lacey Act prohibit a person from knowingly transporting, selling or purchasing in interstate commerce any wildlife that was taken, possessed, transported, or sold in violation of any law or regulation of any state and knowingly engaging in conduct involving the sale of that wildlife having a market value in excess of $350.00. It is deemed to be a sale of wildlife in violation of the Lacey Act for a person for money or other consideration to offer or provide guiding, outfitting, or other services for the illegal taking, acquiring, receiving, transporting or possession of wildlife. I am further aware that under Wisconsin law, it is illegal to hunt bear without a license and that it is illegal to hunt anything after your hunting privileges have been revoked. Further, I am aware that under

Wisconsin law it is illegal to either transfer your hunting approval or permit to another or, while hunting, use or carry any approval issued to another person.

## Background of Investigation

4.      In 2005, the WDNR requested the U.S Fish and Wildlife Service's (USFWS) investigative assistance in conducting a covert investigation into the illegal wildlife activities of John Kellogg and his associates. The WDNR Conservation Wardens advised me that they have apprehended Kellogg numerous times for crimes against wildlife. Yet Kellogg continues to violate the wildlife laws and has developed a commercial enterprise in which he has profited from illegally killed wildlife in Wisconsin, Wyoming, Montana and Michigan.

5.      On July 24, 2009, Kentucky Department of Fish and Wildlife Resources Investigators James Bingham and Charles Wilson provided covert investigative assistance to the WDNR and the USFWS concerning John Kellogg and his associates. Acting in an undercover capacity, Bingham and Wilson posed as houndsmen wanting to purchase hunting hounds. That day they had contact with Kellogg in Oconto County, State and Eastern District of Wisconsin. Kellogg invited Bingham and Wilson to bear hunt with him the following morning and on subsequent days.

6.      On August 1, 2009, Bingham and Wilson met with Kellogg who asked Bingham and Wilson if they intended to pay him as a guide. After Bingham said he did not have a bear tag, Kellogg said he could get a tag for Bingham, but it would be costly. Kellogg said that $1,000.00 was a fair price and that Bingham would have to pay for the tag up-front before the hunt. Kellogg also said if he, Bingham, and Wilson killed a bear using someone else's tag they would have to make sure they didn't get caught by the wardens. If they got questioned by the wardens, Kellogg told Bingham and Wilson to say "so and so gave it to me. That's the best way."

7.    Bingham and Wilson agreed to hunt bears with Kellogg in September 2009. Kellogg told Bingham and Wilson he would arrange for his friend from North Carolina to sell his bear tag to Bingham and Wilson for $1,000.00 so Bingham and Wilson could kill a bear in Wisconsin.

8.    On August 18, 2009, Bingham spoke telephonically with Kellogg who advised that the North Carolina bear tag holder was still willing to sell his bear tag. Kellogg said the price to purchase the bear tag from Kellogg's friend from North Carolina was still $1,000.00.

9.    On September 2, 2009, Bingham spoke telephonically with Kellogg about the bear hunt. Kellogg said he arranged for the North Carolina bear tag holder to meet them on the opening day of bear season and sell the tag to Bingham.   Kellogg stated, "That's all set and done now. We're good to go on that. We just got to be careful when we're doing it. That's all."   Kellogg said the price for the bear tag was still $1,000.00.

10.    On September 8, 2009, Bingham and Wilson arrived in Gillett, Eastern District of Wisconsin for their scheduled bear hunt with Kellogg. Kellogg said if they treed a little bear Bingham could shoot the bear if he wanted. Kellogg's associate, C.H., agreed stating, "You aint got to tag it. You don't have to tag (shoot) the first one you see. Long as it isn't a sow." Kellogg told Bingham if he shot a little bear, "We can just leave it, especially if no one's around or we ain't close to the road. If you've got a problem with that say so now."   Bingham said he came to shoot something and C.H. said, "That's good!"

11.    On September 9, 2009 and September 10, 2009, Investigators Bingham and Wilson participated in a black bear hunt with Kellogg. Kellogg introduced M.B. to Bingham and Wilson as the person providing his bear tag to Bingham.   Kellogg provided guide services and obtained assistance on the illegal bear hunt from C.H. and others.

12. On September 11, 2009, Kellogg used his six hounds and a hound belonging to Bingham and Wilson to chase a large, male black bear up a tree. At Kellogg's direction, Bingham shot and killed the bear without having a tag as required by Wisconsin law. M.B. gave his bear tag to Bingham to place on the illegally killed bear in violation of Wisconsin law. Kellogg assisted in tagging the bear by possessing the tag and validating the day and time stamp on the tag. Kellogg and M.B. took the bear to a WDNR registration station and M.B. made a false record claiming he killed the bear. The bear was then taken to a business with the initials G.M. for processing. Kellogg, M.B. and Investigator Bingham transported the bear hide to a business with the initials B.W.T. to have the hide processed into a bear skin rug. M.B. signed another false record for the bear on the invoice at B.W.T. Bingham provided Kellogg with $1,000.00 for the bear tag and $400.00 for his guide services. The market value of this bear exceeds $350 as the meat, guide services, and hide are worth well in excess of that amount.

13. On September 28, 2009, Kellogg contacted Bingham telephonically and told him his bear meat was ready for pick-up at G.M. On October 4, 2009, Investigators Bingham and Wilson traveled to Wisconsin and met Kellogg in Gillett, Wisconsin. Kellogg said the bear meat was ready for pick-up. Kellogg also discussed other guided hunts he participated in involving the tracking and killing of bears.

14. On October 5, 2009, Bingham and Wilson went to G.M. and met with D.K. D.K. provided Bingham and Wilson with their bear meat. Investigator Wilson paid D.K. the remaining balance of $311.00 for the meat processing.

15. On January 1, 2010, WDNR Investigator Steve Daye requested from the Wildlife section of the WDNR the original black bear registration stubs submitted to the WDNR by M.B. The stub documents that M.B. falsely claimed to have killed a bear on September 11, 2009.

16.     On March 13, 2010, Bingham received a voice message from M.B. in North Carolina stating that the taxidermist called M.B. and said he had finished processing the bear hide into a rug. M.B. told the taxidermist that the bear belonged to him but that Kellogg would pay for the bear skin rug. M.B. told Bingham to call Kellogg to arrange for payment and pick up of the bear rug.   On March 14, 2010, Bingham spoke telephonically with Kellogg who advised Bingham he owed the taxidermist $846.00 for the bear rug. Kellogg later shipped the bear rug to Bingham in Kentucky.

17.     On February 22, 2011, Kellogg appeared in Oconto County circuit court and was convicted for deer hunting violations committed in 2009.   As a result of this conviction, Kellogg's hunting privileges were revoked until February 22, 2014. In later conservations with Bingham and Wilson, Kellogg stated he would not stop hunting.

18.     On July 16, 2011, Bingham spoke telephonically with Kellogg. Kellogg said he could obtain another individual's bear tag for Wilson to use to shoot a bear. Kellogg said his guide service costs would be the same as last time.   On September 4, 2011, Bingham again spoke with Kellogg who said he just finished putting out bear bait.   Kellogg said he obtained a bear tag from an individual in the Merrill, Wisconsin area.

19.     On September 7, 2011, Kellogg, and his associates C.H. and M.R., guided Bingham and Wilson on a bear hunt.   Kellogg used his hounds to chase two bears up a tree. During the hunt M.R. told Bingham and Wilson to refer to Kellogg as "Bill" since Kellogg's hunting privileges were revoked.   During the hunts, Bingham and Wilson observed that on several occasions Kellogg was handling, leading, and loading his hunting dogs.   Kellogg also used a Garmin Astro 220 to track the hounds progress and locations and a two way radio to give directions to the hunting party.   Kellogg said if anyone asked about the dogs they should falsely

claim the dogs belonged to C.H.

20.	On September 8, 2011, Bingham and Wilson again met with Kellogg, and his two associates for the purpose of Kellogg guiding a bear hunt. Kellogg and M.R. released their hounds. Shortly thereafter, Kellogg took the dog leads, followed the directions provided by his Garmin Astro 220 GPS unit, and walked in the direction of his hounds. After locating the hounds, Kellogg took the group to another hunting location. Kellogg continued to communicate with the hunting party via a two-way radio.

21.	On September 9, 2011, Kellogg again guided Wilson and Bingham on a bear hunt. During this bear hunt, M.R. and C.H. assisted in the hunt and communicated with Kellogg using two-way radios. Kellogg released the dogs from his truck and tracked his dogs using his GPS system as they chased a bear. The bear was eventually cornered. M.R. shot at the bear but said he missed. Bingham and Wilson reported that C.H. said he shot and wounded the bear with his 450 rifle. Bingham and Wilson saw Kellogg track the bear with his hounds. Bingham and Wilson later heard four gunshots. When Wilson arrived at Kellogg's location, Kellogg said he had shot and killed the bear. The bear was falsely tagged using M.R.'s bear tag. The bear was then gutted and skinned and M.R. falsely registered the bear at a WDNR registration station. Kellogg directed Bingham and Wilson to transport the bear from the Merrill, Wisconsin area to Oconto Falls, Wisconsin. Kellogg then instructed Bingham and Wilson to take the bear to B.W.T. to have the bear hide made into a rug. Kellogg made arrangements to have the bear carcass taken to G.M. for processing. Bingham and Wilson later met with Kellogg at his residence in Oconto County and provided him with the bear's skull. Kellogg charged Bingham and Wilson $500.00 for his guide services during the bear hunt. Kellogg said the lesser guide fee was warranted because Wilson did not shoot the bear. Bingham provided Kellogg with $100.00 deposit for processing the bear

meat at G.M.   Bingham and Wilson later met with M.R. and paid him $350.00 for the use of his bear tag.   I know that the market value of this bear also exceeded $350.00.

22.   On September 10, 2011, Bingham spoke telephonically with Kellogg who told him no one would know about the illegal bear hunt if M.R. "kept his mouth shut."   Kellogg asked whose name was on the invoice at B.W.T.   Bingham told Kellogg that M.R's name was on the invoice.

## Conclusion

23.   Based upon the foregoing information, I believe there is probable cause to believe that John J. Kellogg has violated provisions of the Lacey Act, more specifically 16 U.S.C. §§ 3372(a)(2) and 3373(d)(1)(B) on the above referenced dates.

24.   Because this affidavit is offered for the limited purpose of supporting the criminal complaint and arrest warrant for John J. Kellogg I have not set forth every fact known to me regarding this incident.   Rather, I have included only those facts which I believe establish probable cause.

Dated this _3_ day of October, 2011.

STEVEN R. STOINSKI
Special Agent
U.S. Fish & Wildlife Service

Subscribed to and sworn to before me this _3_ day of October, 2011.

Notary Public, Permanent Commission